**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **7:20-cr-00243-LSC-SGC-1** |
| | ) | |
| | ) | |
| **DERICK IRISHA BROWN,** | ) | |
| | ) | |
| **Defendant/Movant.** | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the Court on the defendant's motion to suppress statements made to law enforcement allegedly elicited in violation of her Fifth and Sixth Amendment rights. (Doc. 93). Upon consideration, the Court finds that the motion is due to be denied, and the statements will not be suppressed.

## I.  BACKGROUND

The defendant, Derick Irisha Brown ("Brown"), has been charged by indictment with Kidnapping Resulting in Death and Conspiracy to Commit Kidnapping Resulting in Death under 18 U.S.C. §§ 1201(a)(1) & (c).

Brown filed a motion to suppress. (Doc. 93). Brown's motion sought to exclude three sets of statements that she made to law enforcement:

(1)    statements she made during an interview at Birmingham Police Department (BPD) headquarters on October 13, 2019;

(2)    statements she made during an interview at BPD headquarters on October 15, 2019; and

(3)    statements she made while being transported to the Birmingham City Jail by an officer on October 15, 2019.

With regard to the first two sets of statements, Brown argued that they should be suppressed because she lacked the capacity to knowingly, voluntarily, and intelligently waive her right to counsel and her privilege against compulsory self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Brown contended that she could present expert testimony regarding her capacity, or lack thereof, and requested an evidentiary hearing. With regard to the third set of statements, Brown argued that they should be suppressed because they were elicited by custodial interrogation without *Miranda* warnings.

The United States filed a response in opposition to the motion to suppress, arguing that Brown's statements on October 13 and 15, 2019, at BPD headquarters, followed a voluntary, knowing, and intelligent waiver of Brown's rights under *Miranda*, and that Brown voluntarily initiated the conversation with the officer during her transport on October 15, 2019. (Doc. 99). Brown replied in support of her motion. (Doc. 104).

The Court conducted an evidentiary hearing on the motion to suppress on September 22, 2022. The United States presented testimony by BPD Sergeant Talana Brown ("Sgt. Brown"), who testified that, based on Brown's behavior and her interactions with Brown during Brown's interviews on October 13 and 15, 2019, she believed that Brown knew and understood her *Miranda* rights and voluntarily waived them. Sgt. Brown also testified as to Brown's prior involvement in the criminal justice system, particularly her prior kidnapping case. The Government offered as exhibits videos and transcripts of Brown's interviews with law enforcement on October 13, October 15, October 18, and October 21, 2019, as well as *Miranda* waiver-of-rights forms dated October 13, October 15, October 18, and October 21, each signed by Brown. Brown presented testimony and a report from a neuropsychologist, H. Randall Griffith, Ph.D ("Dr. Griffith"), who diagnosed Brown with intellectual disability based on his evaluation of her on June 24, 2022. He opined that this intellectual disability would have impacted Brown's ability to understand the *Miranda* warnings on October 13 and 15, 2019.

After the hearing, the United States submitted a supplemental brief (doc. 113), Brown submitted a response (doc. 115), and the United States submitted a reply (doc. 119). The motion is now fully briefed and ripe for review.

## II.  FACTS

## A.    Brown's October 13, 2019, interview at BPD headquarters

Birmingham Police took Brown into custody October 13, 2019, as a person of interest believed to be involved in a kidnapping. Around 9:30 p.m. on October 13, Brown was brought into an interview room at BPD headquarters. She was barefoot. Brown was interviewed by Detectives Ross, Hardiman, Valentine, Harris, and Howard. The interview is audio and video recorded. At the beginning of the interview, Detective Valentine read Brown her *Miranda* rights and asked if she understood those rights, to which Brown nodded, indicating that she did. Detective Valentine then asked Brown if she wanted to give a statement, to which Brown responded, "Yeah." Brown then read aloud a BPD form affirming that she understood her *Miranda* rights and that she knowingly, intelligently, and voluntarily chose to waive those rights and speak with detectives, and she signed the form. Brown was then interviewed for approximately two hours. Later, Brown spent about 40 minutes working on a written statement as she had been instructed to do by detectives. After she completed the written statement, as she was sitting alone in the room, Brown appeared to be concerned that she was menstruating and might have bled on the chair; she reached her hand into her pants, looked at her fingers, then called for an officer and explained, "I'm bleeding." At one point Brown also asked to use the bathroom, and officers allowed her to do so. At the conclusion of the

interview, Brown was held in custody on a bond revocation for Jefferson County charges unrelated to the present case.

### B. Brown's October 15, 2019, interview at BPD headquarters

On October 15, 2019, Brown was brought back to BPD headquarters for a second interview. The interview was audio and video recorded. Brown sat alone in the room for approximately an hour and a half before the interview began. During this time, when a detective came in to swap out different handcuffs for the ones she was wearing, Brown asked, "Am I going home?" and the detective answered, "You're going home, ma'am. They just got to ask you some questions, okay?" He urged her to tell the truth, and said, "That's why we've got you here, to make sure we give you another opportunity to clear things up, okay?" Brown replied, "I'm not going home?" and the detective said, "Yeah, you're gonna go home." He pointed at an unlit cigarette on the table in front of Brown and added, "We're gonna also allow you an opportunity to smoke a cigarette, okay?" Again, she asked, "I'm going home today?" and the detective answered, "Yes, ma'am. If you ain't did nothing. If you ain't did nothing, ma'am, you're going home, okay?"

BPD Sgt. Brown then entered the room. One of the first things Brown said to her was "I don't understand why I'm still here." She also said, "I just want to know when I'm gonna go home. . . . I ain't even asked for an attorney or nothing like that."

Sgt. Brown and Brown then engaged in a general discussion about how many children Brown has and that she lost custody of her children. Detective Jonathan Ross ("Det. Ross") later joined Sgt. Brown in the interrogation room. Almost immediately after he spoke to Brown for the first time, she asked him, "Am I going home today?" He responded: "Well, let's get through this and then we'll talk about that, okay?" When Brown heard that, she asked, "What you mean?" and began to get more upset. She talked about how she had been working to regain custody of her children: "I just want to go home, you know what I'm saying? Like, I was so close to getting my kids back." Det. Ross then read Brown her *Miranda* rights, and the following exchange occurred:

DET. ROSS: Okay. You wanna talk then let me read you this.

DEFENDANT: Okay.

DET. ROSS: Cause I have to read this again before I (UI), before I talk to you, okay?

DEFENDANT: Yeah (crying). I wanna go home.

DET. ROSS: We all wanna go home, okay?

DEFENDANT: Yes, but I, ya'll are going home.

DET. ROSS: No, we're not. Not until we find baby girl.

DEFENDANT: Un-unh.

DET. ROSS: Trust me, okay? Listen to me just a second, okay? Before I ask you any qu--, well, today's date is Tuesday, October fifteenth, twenty-nineteen.

DEFENDANT: Ya'll gotta promise I can go home.

DET. ROSS: Okay. The time right now is fifteen twenty-eight and we're at Seventeen-ten First Avenue North, Fifth Floor, Homicide Division. Let me read you these uh constitutional rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish. If you cannot, I'm sorry, if you wish to answer any questions without a lawyer present, you still have the right to stop at any time. It is not necessary that you answer any questions posed by a Detective or any other Birmingham Police Department official prior to having bond set. Do you understand what I just read?

DEFENDANT: Bond set?

DET. ROSS: Yes.

DEFENDANT: What's a bond? What you mean bond? (Sighs) His family ain't got no more money, his family ain't got no more money to help me.

SGT. BROWN: That's just basically about the constitutional rights. It doesn't mean you're not being arrested or (UI). They must talked to each other. You know, he said the same thing. He's like what is that.

DEFENDANT: (Crying) I ain't got nobody to help me. I ain't got family.

DET. ROSS: Read this out

SGT. BROWN: We need you to read that out loud. And I'm fixing to get you some tissue, okay?

DET. ROSS: Just read the bottom paragraph.

SGT. BROWN: It's gonna be okay.

DEFENDANT: (UI)

DET. ROSS: Read the bottom (UI). The bottom. You don't have, just read that for me, real loud.

DEFENDANT: I have read and understand fully each of these rights. Having these rights in mind, I wish to make a voluntary statement and answer any questions without contacting any attorney or having one present. (Sniffs) No forced threats or promises have been used by anyone in any way. (UI) I have, I, and I signed this statement after having my (UI)

DET. ROSS: Been orally.

DEFENDANT: Been orally advised my constitutional rights set out above and fully understand them in full.

DET. ROSS: Okay. Do you understand what you just read? That's just saying if you wanna talk to me and let's clear this up, sign right there.

DEFENDANT: But it says over here (UI) something about I can stop at any time for a attorney.

DET. ROSS: Yes.

DEFENDANT: But it says down here not something, that I won't do it.

DET. ROSS: Right. We ask you a question and if you don't wanna answer it, you don't have to. And we'll move on to another question, okay. That's all that says. If you wanna talk to me, let's put your signature right there. And we gonna put the date and the time.

DEFENDANT: Am I going home when I go back?

DET. ROSS: Look, didn't I tell you we gonna cross that step when we get there. I can't answer any questions

DEFENDANT: You not going, you're gonna call somebody else.

DET. ROSS: No, I'm not going home. I'm stuck here until we find baby girl.

DEFENDANT: No, I'm saying you're not going over there to the place with me. You gonna send somebody here to come get me.

(Door opening and closing)

DEFENDANT: (Crying) Fine. Whatever y'all want, I just wanna be told the truth. And

DET. ROSS: Have we lied? Have me and my partner, Sergeant Brown, lied to you?

DEFENDANT: Huh?

DET. ROSS: Have we lied to you? Do you remember talking to us yesterday?

DEFENDANT: Have y'all lied to me?

DET. ROSS: Right.

DEFENDANT: I don't know.

DET. ROSS: Okay. (UI)

DEFENDANT: I mean, I mean you don't have no reason to.

DET. ROSS: Okay, we don't have no reason to lie. We're gonna go through this real quick and be done. Okay? October fifteenth,

DEFENDANT: It's ten

DET. ROSS: Yes. Yes.

SGT. BROWN: Mm-hmm, ten, fifteen, nineteen.

DEFENDANT: I've got a (UI) today at five-thirty.

Brown signed a BPD form affirming that she understood her *Miranda* rights and that she knowingly, intelligently, and voluntarily chose to waive those rights and speak to detectives. Brown was interviewed for approximately one hour. Detectives concluded the interview at 4:23 p.m.

### C.   Brown's statements on October 15, 2019, while being transported to the Birmingham City Jail by a BPD officer

Around 5:45 p.m. on October 15, 2019, a BPD patrol officer picked Brown up from headquarters to transport her to the Birmingham City Jail. About two minutes into the video recorded by the officer's body-worn camera, the transporting officer was talking on his radio to someone else, when Brown said, "Everybody and their momma been lying to me." The officer then asked Brown, "Like what?" and Brown replied, "First they said, um, 48. And then somebody said something about an extension, that they can do an extension . . . ." After a few seconds of simultaneous cross-talk between the two, this exchange followed:

OFFICER: Well you got, you have a—you ever had a kidnapping charge?

DEFENDANT: A who?

OFFICER: A kidnapping charge? Previously?

DEFENDANT: Yeah.

OFFICER: Okay, well—

DEFENDANT: That's with my kids.

OFFICER: Okay, did you go to court?

BROWN: Yes.

OFFICER: Well you got a FTA with that, so you gonna have to deal with that, with the count.

The transport officer and Brown then continued to discuss details of her criminal and custody cases for the next several minutes. Brown appeared to be confused as to why she has a charge for failing to appear preventing her from being able to be released, stating that her court date was not until November 18 in Bessemer, Alabama. In response to being asked by the transport officer, Brown stated the name of the judge presiding over her custody case.[1]

## III.   EXPERT TESTIMONY AT THE SUPPRESSION HEARING

Dr. Griffith testified for the defense as an expert in clinical neuropsychology. On June 24, 2022, Dr. Griffith met with Brown and conducted testing of her

---

[1]      The Court notes that while the body-worn camera footage was submitted into evidence at the suppression hearing, a written transcript of the exchange was not. Accordingly, the Court is making an independent determination of what was said during the transport.

intellectual functioning, her ability to learn and retain information, and whether she was malingering, or feigning difficulties in cognitive functioning. Dr. Griffith also reviewed records from past testing of her intellectual functioning and hospitalizations. Dr. Griffith found no evidence that Brown was malingering. The results of the intelligence test that Dr. Griffith performed on Brown indicated that her I.Q. score was 70, placing her in the second percentile, meaning that she has an I.Q. lower than 98% of the population. Dr. Griffith acknowledged that her intelligence had been tested four times throughout her life and that this score was the lowest reported score that she had ever received. Dr. Griffith concluded from his review of Ms. Brown's testing and history that she is intellectually disabled, a diagnosis that he said is corroborated by deficits in adaptive functioning, such as difficulty with adaptive reasoning, handling everyday responsibilities, and relating to others socially. Dr. Griffith also acknowledged that during his meeting with Brown on June 24, 2022, she acted "cagey," meaning "not being forthright," as well as "sexually provocative," meaning "making statements of a blatant sexual nature that are not commonly provided within the evaluations" that he conducts.

Dr. Griffith watched videos of Brown's October 13 and 15, 2019, interviews at BPD headquarters. Based on his observations and his neuropsychological evaluation of Brown, he concluded that "she did not have a full awareness of the nature of [the

*Miranda*] rights as of October 13, 2019," and that "on the 15th she did not have a full appreciation of the consequences of [a *Miranda*] waiver." Dr. Griffith identified several ways that he thought that Brown's intellectual deficits would hinder her ability to understand the warnings, the rights described to her, and the consequences of waiving them.

First, Dr. Griffith testified that Brown had difficulty reading the waiver statements aloud, indicating that she did not have a basic understanding of the words and phrases of the warning. He opined that an individual who is struggling with reading comprehension is spending more time attempting to pronounce the words correctly than processing their meaning. Although Dr. Griffith admitted that he never asked Brown if she knew the meaning of some of the words used in the standard *Miranda* waiver, he opined that *Miranda* warnings are on a twelfth grade reading level and that Brown likely did not understand them, although he could not remember if he asked her what grade she completed in school.

Second, Dr. Griffith opined that Brown suffers from a severe memory impairment that causes her to be able to recall only the last thing that was said in a series of items or information and causes her to forget all of the previous items or information. According to Dr. Griffith, this impairment is why, during the October 15 interview, Brown asked Detective Ross about a bond immediately after he read

her *Miranda* rights aloud and advised her that she did not have to answer any questions prior to having a bond set. Dr. Griffith stated that since a bond was the last thing that Detective Ross had mentioned, Brown comprehends only the last thing that was said to her, which casts doubt on "her [ability] to understand what came before that."

Third, Dr. Griffith noted that Brown was visibly emotionally distressed during the October 15 *Miranda* advisements and that emotional distress can "detrimentally affect a person's cognitive functioning," including the ability to hold and recall information that has been verbally presented.

Fourth, Dr. Griffith testified that Brown's impairments also caused her to be focused on short term goals and consequences rather than long term goals and consequences, and that is another reason why she asked Detective Ross about a bond on October 15 and repeatedly asked to go home before and throughout that interview.

Finally, Dr. Griffith opined that the fact that Brown stopped Detective Ross during the *Miranda* advisements on October 15 and asked several questions, including about whether she could stop speaking and answering questions at any time, indicates that she never understood the identical warnings that were given to her two days earlier, on October 13. According to Dr. Griffith, she would not have

asked Detective Ross for clarification on those issues if she had understood the warnings the first time on October 13.

## IV.   DISCUSSION

### A.   Brown's *Miranda* waivers during the October 13 and 15, 2019, interviews at BPD Headquarters were voluntary, knowing, and intelligent

In *Miranda v. Arizona*, the Supreme Court expanded the Fifth Amendment privilege against self-incrimination to individuals subjected to custodial interrogation by police. *New York v. Quarles*, 467 U.S. 649, 654 (1984). In *Miranda*, the Court held that before a person is questioned in law enforcement custody, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. After the *Miranda* advisement, "[t]he defendant may waive . . . these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* The Government bears the burden of showing by a preponderance of the evidence that a suspect's in-custody statements were obtained in compliance with the dictates of *Miranda*, 384 U.S. at 436, and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004).

In *Moran v. Burbine*, the Supreme Court explained that whether a suspect voluntarily waived the right to remain silent required a two-part inquiry: first, did the

suspect waive her right voluntarily, in the sense that the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception; second, the suspect must have been aware of both the nature of the right being abandoned and the consequences of the decision to abandon it. 475 U.S. 412, 421 (1986). The validity of a waiver is determined based on the totality of the circumstances surrounding the interview. *Id.* As to the voluntariness of the statement, the totality of the circumstances includes factors such as "the defendant's lack of education or low intelligence, failure to appraise the defendant of his rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014) (citation and internal quotation marks omitted). Although proving a voluntary, knowing, and intelligent waiver "entails the proving of a person's subjective state of mind," the court relies on "the objective indicia of a defendant's mental state." *United States v. Sonderup*, 639 F.2d 294, 297-98 (5th Cir. Mar. 13, 1981). The fact that a suspect is suffering from a mental illness, or depression, does not render a confession involuntary unless there is "official" exploitation of the suspect's condition. *See Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994); *Atkins v. Singletary*, 965 F. 2d 952, 959 (11th Cir. 1992).

Courts have long held that a defendant's lack of education and low intellectual functioning alone does not mean that the defendant was incapable of knowingly, voluntarily, and intelligently waiving *Miranda. See, e.g. United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991); *United States v. Cox*, 509 F.2d 390 (D.C. Cir. 1974) (holding *Miranda* waiver valid despite defendant's fifth grade education where he demonstrated to the court he could read and discuss the warnings); *United States v. White*, 451 F.2d 696, 700 (5th Cir. 1971) (holding *Miranda* waiver valid where rights read to defendant despite his "below average I.Q., fifth grade education, [and] poor reading ability"); *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005) (defendant with a low I.Q. voluntarily and knowingly waived his *Miranda* rights where he "interacted normally and intelligently with the arresting agents and . . . was familiar with the criminal justice system"). Similarly, although "[m]ental illness is a factor to be considered by the trial court, mental retardation does not by itself prevent a defendant from voluntarily [and intelligently] waiving his [*Miranda*] rights." *Dunkins v. Thigpen*, 854 F.2d 394, 399 (11th Cir. 1988) (addressing habeas corpus petition).

In the present case, each of Brown's statements was given after a voluntary, knowing, and intelligent waiver of her *Miranda* rights. In each interview, law enforcement read aloud Brown's *Miranda* rights and had Brown read the same rights

aloud or follow along while those rights were being read aloud. Brown then signed a written waiver prior to making each statement to law enforcement. During the statements, Brown had no apparent difficulty understanding questions being asked by law enforcement and showed thoughtfulness and intent in answering many of those questions. Brown several times appeared to be upset about the areas of questioning but never appeared to have a diminished capacity to understand what was being discussed. Further, there is no evidence that law enforcement ever attempted to take advantage or coerce Brown based on a diminished mental capacity or a mental illness. The interviewing detectives did not use threats, coercion, or deception to induce Brown to waive her rights nor was any form of physical punishment used.

During her October 13, 2019, interview, Brown stopped the detective to ask why she was being detained. She provided her name, date of birth, and address prior to reading the *Miranda* warnings out loud. She read the warnings clearly and without difficulty. She explained to detectives that she got transferred from one apartment to another in the same complex because the first apartment burned down. It is clear from her demeanor, tone of voice, and manner of speech that Brown was alert and aware of where she was, what was happening, the nature of the rights she was waiving, and the consequences of waiving those rights. Brown emphasizes that

during the October 13 interview, she was barefoot and asked to go to the bathroom because she was menstruating. However, simply being barefoot and menstruating, while perhaps contributing to emotional distress felt by Brown, do not impact a woman's ability to understand and waive her *Miranda* rights. Officers allowed Brown to use the bathroom and she continued to interact normally and intelligently with the agents throughout the interview.

On October 15, 2019, Brown was very focused on whether she was going to be allowed to go home, as well as whether she would be allowed to smoke a cigarette. At the beginning of the interview, she asked if she was going home that day, and the law enforcement officer who brough her in the room said "yes ma'am. If you ain't did nothing, if you ain't did nothin ma'am, you, you goin home today, okay?" They continued to discuss when she can go smoke a cigarette, and Sgt. Brown discussed Brown's children with her while they waited for Det. Ross to come in. Det. Ross advised Brown of her *Miranda* rights. She asked a question about a bond and became upset, stating that her boyfriend's family did not have any more money to help her. She then read the *Miranda* warnings out loud and signed the form indicating she fully understood her rights and chose to waive them. After waiving them, she participated in an interview with detectives.

In both interviews, there is no apparent evidence of intellectual disability. Brown can clearly read, and she testified that she reached the eleventh grade in school. Further, Brown is familiar with the criminal justice system, including having been previously arrested and released on bond in a kidnapping case involving her own children who she did not have custody of. The video recording of Brown's transport to the Birmingham City Jail immediately following her October 15 interview with detectives shows her familiarity with the criminal justice system. She discussed articulately and competently with the transport officer another criminal case that she was involved in, indicating that she knew what it meant to be charged with a failure to appear. She also knew her upcoming court date, which court she was charged in, and even the judge's name assigned to her case.

Finally, the Court does not find credible Dr. Griffith's opinion that an intellectual disability and severe memory impairment negatively impacted Brown's ability to understand and appreciate the consequences of waiving the *Miranda* warnings on October 13 and October 15, 2019. As an initial matter, the I.Q. score that Dr. Griffith assigned Brown is lower than any score she had ever received on any other intellectual functioning test during her lifetime, which undermines its reliability. Further, in contrast to Dr. Griffith's opinion that Brown struggled to read the words of the *Miranda* warnings aloud, the videos speak for themselves, which

depict Brown reading the warnings clearly and fairly easily. Likewise, the Court disagrees with Dr. Griffith's opinion that Brown was only able to comprehend the last item in a long list of information and she would immediately forget the rest of the information, and that is why she asked Detective Ross about a bond after he read her rights aloud. Not surprisingly, Brown was focused on whether she would be released, including whether she would be able to make bond. While Dr. Griffith opined that her question meant that she did not understand what a bond was, the record again contradicts his opinion, in that Brown obviously knew what it means to secure a bond because she commented immediately after that her boyfriend's family didn't have any more money to help her. Rather than indicative of some serious memory deficit, the Court finds that Brown's question about bond in fact suggests that she listened to and understood the rights and warnings that Det. Ross was describing to her. The same may be said with regard to her stopping to ask him questions about requesting an attorney and deciding not to answer any more questions. The only logical conclusion from her questions is that she is attempting to make sure she understands the rights that he is explaining to her. Indeed, the Court strongly doubts Dr. Griffith's opinion that Brown suffers from a serious memory impairment, considering that she recalled many details about her other criminal custody case during transport to the Birmingham City Jail.

In sum, the Court finds no constitutional violation with regard to Brown's October 13 and 15, 2019, statements.

### B. Brown initiated the conversation with the BPD officer during her October 15, 2019, transport to the Birmingham Jail

Under *Miranda*, a defendant has the right to remain silent and the right to have counsel present during a custodial interrogation. 384 U.S. at 478-79. While a defendant may waive her Sixth Amendment rights, once a defendant invokes her right to counsel, authorities may not interrogate her until either counsel is made available or "unless the defendant initiates the contact." *United States v. Rojas*, 553 F. App'x 891, 893 (11th Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485–87 (1981)). A person initiates an interview if she clearly evidences a willingness and desire to discuss the investigation. *See Jacobs v. Singletary*, 952 F.2d 1282, 1294 (11th Cir. 1992) (initiating by asking why she was being detained at the police station); *see also Henderson v. Dugger*, 925 F.2d 1309, 1312–13 (11th Cir. 1991) (suspect initiated questioning by asking "what was going to happen next?"); *United States v. Valdez*, 880 F.2d 1230, 1232, 1234 (11th Cir. 1989) (suspect initiated dialogue by inquiring "Where are we going?" shortly after being placed into custody).

In the present case, Brown voluntarily initiated the conversation with law enforcement. During transport, Brown made the statement to the transporting officer that everyone was being dishonest with her. The officer was talking to

someone else on his radio at the time. Brown then continued to ask questions and make statements about her no bond status on pending kidnapping charges. The entire conversation was initiated and continued by Brown. Accordingly, the transport officer did not violate Brown's constitutional rights.

## V.     CONCLUSION

Premised on the foregoing, the defendant's motion to suppress (doc. 93) is hereby **DENIED,** and Brown's statements to law enforcement will not be suppressed.

**DONE** and **ORDERED** on November 3, 2022.

_____
L. Scott Coogler
United States District Judge

160704